Antonia Apps
**REGIONAL DIRECTOR**
Tejal Shah
Celeste Chase
Travis Hill
Olivia Zach
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
Phone:  (212) 336-9135 (Hill)
Email: hilltr@sec.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | <u>**COMPLAINT**</u> |
| -against- | 24 Civ. 4149 |
| **MARC HENRY MENARD,** | |
| Defendant, | **JURY TRIAL DEMANDED** |
| -and- | |
| **LAESHA JEAN-LOUIS,** | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Marc Henry Menard ("Menard") and Relief Defendant Laesha Jean-Louis ("Jean-Louis") alleges as follows:

## SUMMARY

1. Menard made material misstatements to dozens of investors when soliciting investments in the form of promissory notes, defrauding investors out of at least $1.65 million.

2. From approximately July 2021 through September 2023 (the "Relevant Period"), Menard solicited investments from more than 50 individuals, many of whom were members of the Haitian-American community, by knowingly or recklessly misrepresenting his past investment success, how he would use investor funds, and the returns investors would receive.

3. Menard told a number of investors that he or his business, MarcoTech, would use their funds to trade in stocks and options, and he lured investors with purportedly guaranteed interest payments of 10 to 20 % per month—the equivalent of a 120 to 240 % non-compounded annual return—which Menard knew or recklessly disregarded he could not guarantee, and ultimately did not pay in full as promised.

4. Menard was not the successful investor he claimed to be. During the Relevant Period, Menard lost nearly $700,000 trading securities, primarily using investors' funds. But Menard concealed his losses from prospective investors while falsely boasting of his successful performance.

5. Menard also misappropriated a significant amount of investor money for his personal use by spending hundreds of thousands of dollars on luxury vehicles, international travel, gifts, rent and other personal expenses, as well as to make payments to prior investors in a Ponzi-like manner, contrary to investors' expectations that he would use their money to trade.

6. Menard also diverted significant amounts of investor money to Jean-Louis, with whom he had a romantic relationship.

7. When Menard could no longer make promised interest payments to investors or repay the principal on their investments, he resorted to additional falsehoods to conceal his scheme, including by inflating the balance in his bank account while falsely or misleadingly claiming that he could not return some investors' money because the bank had frozen his funds.

8. In total, investors entrusted Menard with at least $1.65 million and incurred substantial losses as a result of his failure to repay them as promised.

## VIOLATIONS

9. By virtue of the foregoing conduct and as alleged further herein, Defendant Menard violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

10. Unless Menard is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

12. The Commission seeks a final judgment: (a) permanently enjoining Menard from violating the federal securities laws and rules this Complaint alleges he has violated; (b) permanently enjoining Menard from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts; (c) ordering Menard to disgorge all ill-gotten

gains he received and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering Menard to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; (e) permanently prohibiting Menard from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (f) ordering Jean-Louis to pay, with prejudgment interest, all ill-gotten gains by which she was unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and (g) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

14. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15. Venue lies in the Eastern District of New York pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this complaint occurred within the Eastern District of New York, including

that Menard's operations were primarily located in Nassau County, New York, and certain of the investors who were defrauded by Menard were residents of Nassau County, New York.

## DEFENDANT

16. **Menard**, age 40, was a resident of New York at the time of the conduct described below but Menard's current whereabouts are unknown. Menard is the owner and sole operator of MarcoTech and functioned as its investment adviser.

## RELIEF DEFENDANT

17. **Jean-Louis**, age 30, resides in New York, and had a romantic relationship with Menard during part of the Relevant Period. She received significant amounts of investor money through Menard.

## RELEVANT ENTITY

18. **MarcoTech** was incorporated in New York in 2022 and is currently registered with the New York Department of State as a limited liability company with a corporate address in Mineola, New York. MarcoTech has no known active office location, and is solely owned by Menard, who used MarcoTech as a vehicle to accept investor funds and carry out his fraud.

## FACTS

### I. BACKGROUND

19. Menard used his standing within the Haitian-American community to lure friends and other community members into investing with him or MarcoTech based on false and misleading representations.

20. Menard and MarcoTech issued promissory notes pursuant to which the applicable issuer guaranteed monthly interest payments to investors of 10 to 20 % of their principal investment. At times, investors did not collect their monthly interest payments and instead rolled

over the accrued interest into a new investment.

21. Until 2022, the promissory notes were generally issued by Menard personally, but beginning in 2022, some of the notes Menard provided to investors identified the borrower as MarcoTech, which he at times described as his investment business.

22. The promissory notes that Menard provided to investors often contained unexecuted signature lines for the borrower (Menard or MarcoTech).

23. In oral conversations or other communications before investing, Menard typically led purchasers of the promissory notes to believe that he would use their money for trading. Regardless of whether a promissory note identified Menard personally or MarcoTech as the borrower, Menard both held himself out and functioned as the sole decision-maker with respect to trading.

24. Based on communications with Menard, at least some investors understood that Menard's compensation for managing their investments would come from any trading profits that exceeded investors' guaranteed returns.

25. Once Menard obtained investors' money, he generally pooled their funds in bank accounts owned either by MarcoTech or Menard personally (collectively, the "Bank Accounts"). On certain occasions, he directed that investors send their money to a bank account belonging to Jean-Louis.

26. During the Relevant Period, the primary source of income in the Bank Accounts was money from investors.

## II.  MENARD'S MATERIAL MISSTATEMENTS AND FRAUDULENT SCHEME

27. As referenced above, Menard commonly led purchasers of the promissory notes to believe that he would use their money to conduct trades. For example, when soliciting

investments, Menard had conversations in which he explicitly told at least some prospective investors that he would use their money to trade stocks.

28.     Menard did not generally disclose his intention to use investor funds for other purposes, such as to pay personal expenses or make repayments to other investors.

29.     Nevertheless, contrary to investors' expectations, Menard at times made payments due under the promissory notes in a Ponzi-like manner, using money in the Bank Accounts from other investors.

30.     By way of example, in August 2021, Menard received a $55,800 investment from Investor-A.  Over the ensuing eight days, Menard transferred only $13,000 to a brokerage account to conduct trading but used more than $34,000 for other purposes, including payments to other investors totaling at least $19,250.

31.     Menard also used money in the Bank Accounts—which came primarily from investors—to pay hundreds of thousands of dollars in personal expenses.  For example, Menard used the Bank Accounts to pay for luxury cars, including a BMW and a Mercedes-Benz, international travel, and monthly rent at a luxury apartment building.

32.     During the Relevant Period, Menard also directed a net of at least $146,880 consisting primarily of investor funds to his girlfriend, Jean-Louis, through a combination of sending her money from the Bank Accounts, routing investor deposits directly into Jean-Louis's account, and paying for her expenses, including $60,000 for a downpayment on a BMW.

33.     At times, Menard diverted investor money for purposes other than trading within hours or days of receiving new investor funds.

34.     As an illustrative example, on or about June 29, 2022, Menard received a $15,000 investment in one of the Bank Accounts from Investor-B, who understood that Menard would

use his funds exclusively for trading.

35. Prior to Investor-B's deposit, the relevant account had a balance of only $20,122.52 as of June 28, 2022. Over the course of the next 1-2 days, Menard exhausted all the funds in that account, including Investor-B's money, on payments to possible investors and other expenditures unrelated to trading.

36. Of the minimum $1.65 million Menard raised from investors and deposited into Bank Accounts, at least $200,000 was never transferred to a brokerage account for trading.

37. Menard's use of investor money to make payments to other investors and pay personal expenses was contrary to his express representation to at least some investors that he would use investor money for trading.

38. Menard did use some investor money to trade stocks and options, but during the Relevant Period, he lost approximately $696,197 on his trades.

39. Menard had negative returns in 11 out of 16 months of active trading during the Relevant Period and conducted no trades during 3 months of the Relevant Period.

40. However, Menard concealed his losses from prospective and existing investors, instead falsely pitching them on his supposed trading expertise.

41. For example, in or about July 2021, Menard stated orally to a group of prospective investors at a meeting in Uniondale, New York, that he was in the top 1 % of traders in the country.

42. In fact, from July 2020 through June 2021, Menard had lost approximately $33,547.41 on his trades.

43. In or around September 2021, Menard told then prospective Investor-B that he had been trading for a couple of years and was a millionaire because of his investments. Shortly

thereafter, Investor-B invested $10,000 with Menard.

44. Similarly, when soliciting Investor-C in or around January 2022, Menard stated, in substance, that he had been trading for years and was gifted at investing and trading. After speaking with Menard, Investor-C made an initial investment of $10,000 on January 31, 2022.

45. The foregoing statements regarding Menard's trading performance and success were false or misleading because, while Menard had been trading since at least July 2020, he had net profits on his trades of less than $20,000 as of September 2021, and net losses of more than $400,000 as of January 2022.

46. By August 2022, Menard had lost more than $650,000 on trading, including more than $600,000 during the Relevant Period, and was running out of money to consistently pay monthly interest to investors and return their principal as promised.

47. Yet, Menard continued to tout his purportedly successful trading performance. For example, in an August 2022 text message exchange, Menard attempted to solicit additional funds by writing, "I trade bro. I'm good. I make money everyday as usual."

48. Some of Menard's investors were unsophisticated in securities and invested with Menard or his entity, MarcoTech, largely because of Menard's claimed (but fictitious) trading success.

49. Menard's representations regarding his trading success and his use of investor funds were important because profitable trading would have provided a source of funds for Menard and MarcoTech to make their promised payments to investors under the promissory notes.

50. By late 2022, though, Menard increasingly missed monthly interest payments to investors, leading many investors to request the return of their money. Rather than inform

9

investors that he no longer had sufficient funds to make consistent monthly interest payments or repay their principal, Menard continued to deceive them.

51. For example, sometime in or after August 2022, Menard sent multiple investors a text message containing a screenshot of an ATM receipt showing an account balance of approximately $8 million. Menard wrote in the text message: "$3M [is] for people I invested for. And the rest is mine." This falsely conveyed to investors that Menard and/or MarcoTech owned a bank account with a balance of $8 million at or around the time of the message.

52. In fact, from August 2022 through the end of the Relevant Period, the combined balances in the Bank Accounts never exceeded $265,000.

53. Menard also provided false excuses to some investors as to why he could not make their promised interest payments or return their principal.

54. For example, Menard stopped making monthly interest payments to Investor-D in or around August 2022.

55. In October 2022, Menard blamed his inability to make the promised monthly payments to Investor-D on a problem with "the Feds" resulting from the number of transactions in the Bank Accounts. This was at the very least misleading because, following Menard's trading losses and misappropriation of investor funds, he did not have enough money to satisfy his obligations to all investors under their promissory notes.

56. Menard also told at least several investors that he could not make promised payments because his bank accounts were frozen, at times blaming the bank's limit on the number or frequency of transactions. This was at the very least misleading: Menard could not repay all investors as promised because he did not have enough funds to do so.

57. Menard knew or recklessly disregarded it was false or misleading when he told at

least some investors that he was a successful trader and that he made millions of dollars by trading, when in fact he lost money trading prior to and during the Relevant Period.

58. Menard knew or recklessly disregarded it was false when he told at least some investors he would use their money for trading, when in fact, he planned to, and did, use investor money for other purposes throughout the Relevant Period.

59. Menard knew or recklessly disregarded it was false or misleading when he told investors that he or MarcoTech would pay monthly interest payments equal to a 10 to 20 % monthly return when his trading profits were insufficient to sustain those payments and he and MarcoTech had no other significant source of income besides money from new investors.

60. Pursuant to Menard's fraudulent scheme, he successfully solicited at least $1.65 million from more than 50 investors. Although Menard made some payments of principal and interest, investors, in the aggregate, did not receive the full return of their principal, let alone their promised interest.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

61. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 60.

62. Menard, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently has engaged in

one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

63. By reason of the foregoing, Menard, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

64. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 60.

65. Menard, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

66. By reason of the foregoing, Menard, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)

67. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 60.

68. At all relevant times, Menard was an investment adviser, under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

69. Menard, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

70. By reason of the foregoing, Menard, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder**

71. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 60.

72. At all relevant times, Menard was an investment adviser, under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)], to a pooled investment vehicle, as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

73. Menard knowingly, recklessly, or negligently (i) made one or more untrue statements of material facts or omitted material facts necessary to make the statements made, not misleading, to investors or prospective investors in the pooled investment vehicle; and/or (ii) engaged in one or more acts, practices, or courses of business that were fraudulent, deceptive, or manipulative, with respective to any investor or prospective investor in the pooled investment vehicle.

74. By reason of the foregoing, Menard, directly or indirectly, singly or in concert,

has violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Relief Defendant Jean-Louis)

75. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 60.

76. Jean-Louis received at least $146,880 in ill-gotten gains from Menard, and Jean-Louis has no legitimate claim to these ill-gotten gains.

77. Jean-Louis obtained at least $146,880 under circumstances in which it is not just, equitable, or conscionable for her to retain the funds.

78. Jean-Louis has therefore been unjustly enriched in the amount of at least $146,880.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently enjoining Menard and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80(b)-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

**II.**

Permanently enjoining Menard from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

**III.**

Ordering Menard to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**IV.**

Ordering Menard to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9];

**V.**

Permanently barring Menard from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**VI.**

Ordering Jean-Louis to pay, with prejudgment interest, all ill-gotten gains by which she was unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## VII.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
June 11, 2024

>Respectfully submitted,

>By: /s/ Antonia Apps
>Antonia Apps
>Tejal Shah
>Celeste Chase
>Travis Hill
>Olivia Zach
>*Attorneys for Plaintiff*
>U.S. Securities and Exchange Commission
>New York Regional Office
>100 Pearl Street
>New York, New York 10004-2616
>Tel: (212) 336-9135 (Hill)
>Email: hilltr@sec.gov